[No. A026927. First Dist., Div. Two. Mar. 26, 1987.]

RICHARD SEELEY, Plaintiff and Respondent, v.
BRUCE A. SEYMOUR et al., Defendants and Appellants.

RICHARD SEELEY, Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant, Cross-complainant and Respondent;

SAFECO TITLE INSURANCE COMPANY, Cross-complainant and Appellant;
BRUCE A. SEYMOUR, Cross-defendant and Appellant.

848

COUNSEL

Daniel J. Custer, Miller, Starr & Regalia, Harry D. Miller, Edmund L. Regalia and Amy Matthew for Defendants and Appellants, Cross-complainant and Appellant and Cross-defendant and Appellant.

Cooper, White & Cooper, John Mahoney and A. Megan Madden for Plaintiff and Respondent.

No appearance for Defendant, Cross-complainant and Respondent.

OPINION

**SMITH, J.**—In these consolidated actions for slander of title and negligence in connection with the recordation of a purported "Memorandum of Agreement" to lease plaintiff's property, a jury awarded plaintiff and respondent Richard Seeley (Seeley) $200,000 in compensatory damages jointly and severally against defendants-appellants Bruce A. Seymour (Seymour), Safeco Title Insurance Company (Safeco) and defendants City and County of San Francisco and its recorder Thomas Kearney (the City). The jury also awarded Seeley $2.66 million punitive damages against Seymour. Only Seymour and Safeco appeal from the ensuing judgment.

## BACKGROUND

The facts of this case are largely undisputed. We summarize the essential ones.

In 1972, Richard Seeley acquired an unimproved lot located at Washington and Battery streets in the downtown area of San Francisco. He bought the lot from the City at an auction for $97,000. Over the next 10 years, Seeley received many inquiries and offers to purchase the property, none of which culminated in a sale.

In early 1978, Seymour, through his broker Bill Graham, submitted a written offer to purchase the property for $250,000. Seeley rejected the offer,

but indicated a willingness to enter into a long-term lease of the property. Intensive negotiations between the parties took place over the remainder of the year, during which both sides were represented by attorneys and proposed leases were drawn.

At one point in the negotiations, Seeley wrote a letter to broker Graham dated April 10, 1978, outlining several provisions which he would require before he would enter into a "definite, legally binding agreement." The letter encouraged a "determination that we are or are not in striking distance . . . before further effort is expended." Shortly after receiving the letter, Seymour wrote at the bottom "Agreed and accepted. Bruce A. Seymour 4-14-78" and gave the letter to Graham who forwarded it to Seeley. Seeley interpreted the document as a signal from Seymour to proceed with negotiations and had his attorney prepare an outline of a proposed lease. Serious negotiations for a 60-year ground lease ensued.

On August 30, 1978 Seymour unilaterally prepared a document which he titled "Memorandum of Agreement" in which he set forth what he asserted were the essential terms of a ground lease between himself and Seeley. (A copy of the memorandum of agreement is reproduced at the end of this opinion as an appendix.) Seymour signed the memorandum himself and had his signature notarized. On September 18, 1978, Seymour took the document to an escrow officer at the Modesto office of Safeco Title Company. Seymour was a regular customer of Safeco's, which had been involved in several of his business dealings in Modesto. As an accommodation to Seymour, Safeco agreed to record the document in San Francisco. At this point, Seeley knew nothing of the memorandum.

On October 17, 1978, Safeco presented the memorandum, in a packet with 10 other documents *insured by Safeco,* to the San Francisco County Recorder. Despite the fact that the memorandum lacked Seeley's signature, the recorder accepted it and recorded it.

No lease was ever signed. Negotiations between Seymour and Seeley broke down in January 1979. Two years later Seeley became involved in intensive negotiations to sell the property to a group of investors known as the "Eicon Group." During the negotiations, the group ordered a preliminary title report, which disclosed the existence of the recorded memorandum.

When Seeley found out about the recordation, he demanded, through his attorneys, that Seymour execute a quitclaim deed to the property to remove the "cloud" on his title. Seymour did not respond.

A short time later, Seeley reached an agreement to sell the property to a group of investors known as the "Buchholz Group" (also known as Wash-

ington & Battery Associates) for $900,000. An option agreement was executed on March 16, 1981.

One condition of the proposed sale was that Seeley convey free, clear and marketable title. The Buchholz purchasers threatened not to proceed with the transaction until Seymour's claim of interest was removed. When a second demand letter from Seeley's attorney had no effect on Seymour, Seeley filed action No. 778-831 against Seymour and Safeco for slander of title and to quiet title. Seymour responded with a cross-complaint for breach of contract.[1] When no quick resolution of the suit appeared likely, Seeley filed action No. 788-104 against the City and County of San Francisco and Thomas Kearney, recorder, for negligent recordation of the Seymour memorandum. Eventually, the two actions were consolidated by court order. Safeco and the City filed indemnity cross-complaints against Seymour and against each other.

On June 9, 1981 the Buchholz purchasers notified Seeley of their election to exercise the option to buy. Seeley's early motion for summary judgment against Seymour failed, and the original date for close of escrow of November 16, 1981 had to be postponed. The sale to the Buchholz group was finally consummated in February 1982. Seeley "was perfectly happy" to delay the closing from late 1981 to early 1982 because of the tax advantages to him.

The Buchholz group successfully intervened in this lawsuit under the name "Washington and Battery Associates." In December 1982 the interveners obtained a summary judgment order declaring Seymour's memorandum "of no force or effect," and expunging it from the record.

Seeley's actions against Seymour, Safeco and the City proceeded to jury trial. At the conclusion of the case, Seeley was permitted to amend his complaint to state a cause of action against Safeco for negligence.

The jury returned with a verdict in favor of Seeley for $200,000 compensatory damages against all defendants and $2.66 million in punitive damages against defendant Seymour only. Before the jurors could resolve the question of comparative indemnity rights among Seymour, Safeco and the City, one of Seymour's former attorneys walked up to one of them and congratulated him for having "recognized a crook." To obviate the possible prejudice from this incident, all defense counsel stipulated to excusing the jury and having the court decide the apportionment and indemnity issues.

---

[1]Seymour's cross-complaint was dismissed on a motion for nonsuit at the conclusion of his case. He does not appeal from that ruling.

The trial judge apportioned liability 92 percent to Seymour, 5 percent to Safeco and 3 percent to the City. Safeco and the City were awarded full indemnity against Seymour and partial indemnity against each other "insofar as any amounts they actually pay to plaintiff Richard Seeley might exceed their proportionate share of responsibility as determined above."

## APPEAL

### *Jurisdictional Issues*

Before we reach their merits, we address Seeley's contention that both Seymour's appeal and Safeco's appeal are invalid and should be dismissed.

## I

■ Seeley initially challenges the efficacy of Seymour's notice of appeal because the signature on the notice purporting to be that of "Bruce A. Seymour, In Propria Persona" is a forged one. In support of this assertion, Seeley attaches to his brief a declaration from his attorney stating that he is familiar with Seymour's signature and that the one appearing on the notice of appeal isn't genuine.

We find that the notice substantially complies with rule 1(a) of the California Rules of Court. Rule 1(a)[2] provides that a notice of appeal shall be signed "by the appellant or by his attorney . . . ." While the cases relied upon by Seeley (*Isom* v. *Slaugher* (1962) 200 Cal.App.2d 700, 705 [19 Cal.Rptr. 541]; *Edlund* v. *Los Altos Builders* (1951) 106 Cal.App.2d 350, 357 [165 Cal.Rptr. 57]) hold that a notice of appeal signed by someone not authorized to act on appellant's behalf is ineffectual, it is well recognized that Rule 1(a) purposes are satisfied when *any person,* attorney or not, who is empowered to act on appellant's behalf, signs the notice. (*Ehret* v. *Ichioka* (1967) 247 Cal.App.2d 637, 641 [55 Cal.Rptr. 869]; *Edlund* v. *Los Altos Builders, supra,* 106 Cal.App.2d at p. 357; *Estate of Hultin* (1947) 29 Cal.2d 825, 832 [178 P. 756].) There is no competent evidence that the notice was signed by anyone other than Seymour. In a letter attached to his brief, Seeley's counsel avers that the notice was signed by Seymour's son. Even if that is the case, we must conclude he was authorized to so act in the absence of a clear and satisfactory showing that such authority was lacking. (*United States of Mexico* v. *Rusk* (1930) 109 Cal.App. 497, 500 [293 P. 108].)

Rule 1(a) declares that notices of appeal shall be liberally construed in favor of their sufficiency. ■ This state has a "strong public policy in favor

---

[2]All "rule" references are to the California Rules of Court.

of hearing appeals on their merits and of not depriving a party of his right to appeal because of technical noncompliance where he is attempting to perfect his appeal in good faith." (*Jarkieh* v. *Badagliacco* (1945) 68 Cal.App.2d 426, 431 [156 P.2d 969].) ▮ In the absence of any evidence that the notice of appeal was signed by an unauthorized person, we refuse to dismiss the appeal from this $3 million judgment upon the hypertechnical grounds urged here.

## II

The following chart illustrates the procedural history leading up to Safeco's filing of the notice of appeal (all dates are in 1984):

| Date | Event |
| --- | --- |
| February 7 | Judgment entered; Seeley mails all parties notice of entry of judgment |
| February 8 | Amended judgment prepared by the City is signed and entered |
| February 9 | The City mails all parties notice of entry of amended judgment |
| February 24 | Safeco files notice of motion and motion for judgment notwithstanding the verdict and for new trial |
| April 5 | By minute order, court denies motion for new trial |
| April 9 | By minute order, court vacates amended judgment and reinstates judgment of February 7, 1984 nunc pro tunc |
| May 4 | Safeco files notice of appeal |

▮ Rule 3(a) provides that where a valid notice of motion for new trial is served and filed by any party and denied, the time for filing a notice of appeal is extended until 30 days after entry of order denying a new trial. Since Safeco's notice of appeal was filed 29 days after the court denied its new trial motion, it appears to be perfectly timely.

Seeley, however, contends the notice was untimely. He argues that because of the court's nunc pro tunc minute order of April 9, the only *valid* judgment was the one entered and mailed to all parties on February 7. He contends

that since *17* days elapsed from the February 7 mailing of notice of entry of judgment until the time that Safeco's notice of intention to move for new trial was filed, the latter notice was two days late under Code of Civil Procedure section 659 subdivision (2). Seeley insists that Safeco's untimely new trial notice was therefore not "valid", and could not extend the time for appeal under rule 3(a). (*Radford* v. *Crown City Lumber & Mill Co.* (1958) 165 Cal.App.2d 18, 21 [331 P.2d 438].) He further contends that the notice of appeal cannot be saved under rule 2(a) either, since it was filed more than the permitted 60 days following the February 7 mailing of notice of entry of judgment. The argument is overly technical and has persuasive force only if one puts aside notions of common sense and fair play.

When Safeco filed its motion for new trial, the only valid judgment was the *amended* judgment mailed by the City on February 9. Safeco's notice of intention to move for new trial was filed 15 days later and was therefore "valid" under Code of Civil Procedure section 659. Because Safeco's new trial notice was valid, Safeco successfully invoked that provision of rule 3(a) which extends the time for appeal. To hold, as Seeley would have us do, that the April 9 nunc pro tunc order *retroactively* invalidated Safeco's new trial notice would contravene the settled principle that a party's right to appeal cannot be cut off by the reinstatement of a judgment nunc pro tunc. (*Lippert* v. *AVCO Community Developers, Inc.* (1976) 60 Cal.App.3d 775, 779 [131 Cal.Rptr. 430]; *Phillips* v. *Phillips* (1953) 41 Cal.2d 869, 875 [264 P.2d 926].) It would also mean that Safeco forfeited its right to appeal because it did not have clairvoyance to foresee that the trial court would later vacate the amended judgment and reinstate the original one.[3] We find no defect in the timeliness of the notice.

As an alternative ground for our conclusion, we hold that the entry of the nunc pro tunc minute order on April 9 constituted a *new judgment* for purposes of appeal and therefore started a new appeal period running pursuant to rule 2(a), within which Safeco timely filed its notice. (See *Lippert* v. *AVCO Community Developers, Inc., supra,* 60 Cal.App.3d at p. 779.)

*Liability Issues*

III

The alleged tortious conduct which was the heart of Seeley's lawsuit was the recordation of the infamous "Memorandum of Agreement" which purported to memorialize a 60-year lease agreement between Seymour and

---

[3]Under Seeley's reasoning, even if Safeco had come rushing into court with a notice of appeal on April 9, one minute after entry of the nunc pro tunc order, the appeal would still be untimely, because 60 days had elapsed from February 7.

Seeley, but to which Seymour was the lone signatory. Seeley vigorously and successfully argued that it was this "cloud" on his title which gave rise to all of the damages for which he sought compensation.

Safeco's prime contention on this appeal (and one in which Seymour concurs) is that because the memorandum was void *on its face* and *as a matter of law,* it could not have constituted a "cloud" on Seeley's title and therefore could not have given rise to an action for damages for slander of title. Appellants argue that the trial judge should have taken this issue from the jury and instructed them accordingly.

Before addressing the argument, it is necessary to decide whether appellants should be precluded from raising this point for the first time on appeal, inasmuch as it was never presented to the trial court.

■ Ordinarily, when a party changes the theory of his case on appeal the appellate court is precluded from reviewing the new theory. (*Fenton* v. *Board of Directors* (1984) 156 Cal.App.3d 1107, 1113 [203 Cal.Rptr. 388]; 9 Witkin, Cal. Procedure (3d. ed 1985), Appeal § 316, p. 327.) However, when "the facts with reference to the contention newly made on appeal appear to be undisputed and . . . no different showing could be made on a new trial it is deemed appropriate to entertain the contention as a question of law on the undisputed facts and pass on it accordingly." (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738]; see, e.g., *Fenton* v. *Board of Directors, supra,* at p. 1113; *City of Merced* v. *State of California* (1984) 153 Cal.App.3d 777, 781 [200 Cal.Rptr. 642]; *Barton* v. *Owen* (1977) 71 Cal.App.3d 484, 491 [139 Cal.Rptr. 494].) ■ An appellate court has the duty to make an independent interpretation of a written instrument on its face and is never bound by the determination made at the trial level. (*Estate of Platt* (1942) 21 Cal.2d 343, 352 [131 P.2d 825]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].) ■ The instant contention requires only the interpretation of a document and the application of such interpretation to an undisputed factual situation. We therefore hold that Safeco may raise this argument for the first time on appeal. (See *Bernson* v. *Bowman* (1960) 182 Cal.App.2d 697, 706 [6 Cal.Rptr. 445].)

All parties to this appeal concur that the memorandum was void on its face and not entitled to recordation as a matter of law. This proposition seems clear enough. Not having been signed by the purported lessor, the document could not create a legal interest in the property (*Munford* v. *Humphreys* (1924) 68 Cal.App. 530, 535 [229 P. 860]), nor did it qualify for recording under the recording statutes. (Gov. Code, §§ 27280, 27288.)

Citing a number of appellate decisions, none of which is less than 50 years old (e.g., *Pixley* v. *Huggins* (1860) 15 Cal. 127; *Cohen* v. *Sharp* (1872) 44 Cal. 29, 31; *Hager* v. *Spect* (1878) 52 Cal. 579, 584; *Hughes* v. *Beekley* (1927) 85 Cal.App. 313, 316 [259 P. 337]), Safeco argues that, because of its facial invalidity, Seymour's memorandum was legally insufficient to create a "cloud on title" and consequently incapable of giving rise to an actionable tort.

The cases cited by Safeco all grow out of the ancient common law chancery practice of cancelling instruments affecting real property, which practice was preserved in the original enactment of the Civil Code. (See *Castro* v. *Barry* (1889) 79 Cal. 443, 445 [21 P. 946].) Thus, Civil Code section 3412 permits the court to order an instrument adjudged void, "delivered up" or "cancelled" if "there is a reasonable apprehension that if left outstanding it may cause serious injury," while section 3413 provides that "[a]n instrument, the invalidity of which is apparent on its face . . . is not to be deemed capable of causing injury, *within the provisions of the last section.*" (Italics added.)

The ancient cases cited by Safeco miss the point. They simply stand for the proposition that an equitable action to cancel a recorded instrument will not lie where the document shows on its face that it is void. The reasoning of these decisions is that an instrument void on its face casts no legal cloud on title and thus presents no cause for a court of equity to interfere. (See *Marshall* v. *Desert Properties* (9th Cir. 1939) 103 F.2d 551, 552.)

The recordation of an instrument facially valid but without underlying merit will, of course, give rise to an action for slander of title (*Forte* v. *Nolfi* (1972) 25 Cal.App.3d 656, 685-686 [102 Cal.Rptr. 455]). Moreover, the detriment suffered by plaintiff is often referred to as a "cloud" (e.g. *Coley* v. *Hecker* (1928) 206 Cal. 22, 29 [272 P. 1045]). However, it does not follow, as appellants maintain, that if the recorded document is facially insufficient to create a legal "cloud," the party whose property is affected is deprived of an action for wrongful disparagement of title.

California has adopted the definition of the tort set forth in section 624 of the Restatement of Torts, which provides: "One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land . . . under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused." (*Howard* v. *Schaniel* (1980) 113 Cal.App.3d 256, 263-264 [169 Cal.Rptr. 678]; see *Gudger* v. *Manton* (1943) 21 Cal.2d 537, 541 [134 P.2d 217] (disapproved on other grounds in *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 381 [295 P.2d 405]); *Forte* v.

*Nolfi, supra,* 25 Cal.App.3d at p. 685; *Davis* v. *Wood* (1943) 61 Cal.App.2d 788, 797 [143 P.2d 740].) ▮ The elements of the tort are (1) publication, (2) absence of justification, (3) falsity and (4) direct pecuniary loss. (*Howard* v. *Schaniel, supra,* 113 Cal.App.3d at p. 264; Rest.2d Torts, § 623A.) ▮ Nowhere does a California decision require that the published matter create a legal "cloud" upon plaintiff's title to constitute a disparagement. Indeed, the tort may be committed through the use of oral statements (*Burkett* v. *Griffith* (1891) 90 Cal. 532, 537-538 [27 P. 527]) or signs (*Phillips* v. *Glazer* (1949) 94 Cal.App.2d 673, 674 [211 P.2d 37]), neither of which involve any recordation whatsoever.

▮ "[P]rotection from injury to the salability of property is the thrust of the tort." (*Howard* v. *Schaniel supra,* 113 Cal.App.3d at p. 264) ▮ Therefore, the key to whether the defendant's conduct is actionable is not whether he has succeeded in casting a legal cloud on the plaintiff's title, but whether he could reasonably foresee that "the conduct of a third person as purchaser or lessee [of the property] *might be determined thereby. . . .*" (Rest., Torts, § 624, italics added.)[4]

The spurious "Memorandum of Agreement" appears to be a perfect example of a publication of no real legal consequence, but one which Seymour could well anticipate might chill the enthusiasm of any prospective purchaser of Seeley's property. Whether a reasonable purchaser would alter his conduct based upon Seymour's memorandum was a factual issue properly left to the jury to resolve, which resolution is not challenged here.

*Gudger* v. *Manton, supra,* 21 Cal.2d 537 supports our conclusion that a recorded document may have no effect on title yet still give rise to a slander of title cause of action. There, defendant obtained a judgment against plaintiff's wife and recorded a writ of execution upon all the interest *she* had in a certain property belonging to plaintiff. The property was entirely plaintiff's separate property and thus the writ had no effect on plaintiff's title. In plaintiff's suit for slander of title the California Supreme Court rejected the notion that a legal cloud must be created in order to give rise to the action. "The essence of the matter is that there has been an actionable disparagement of title if the plaintiff has been proximately damaged thereby. . . . Appellant refers to several cases from other jurisdictions apparently contrary to the views herein expressed, but we are not inclined to agree with the holdings therein. If the matter is reasonably understood to cast doubt upon the exis-

---

[4]The Restatement Second of Torts, section 629 describes "disparagement" in the following terms: "A statement is disparaging if it is understood to cast doubt upon the quality of another's land, . . . or upon the existence or extent of his property in them, and [¶] (a) the publisher intends the statement to cast the doubt, or [¶] (b) the recipient's understanding of it as casting the doubt was reasonable."

tence or extent of another's interest in land, it is disparaging to the latter's title where it is so understood by the recipient. (Rest., Torts, § 629.) As we have seen, the reasonable imputation of the recording was a claim of an interest adverse to plaintiff's title. *Whether a cloud on the title in the technical sense existed was immaterial.* While it is true the execution claimed only such interest as plaintiff's wife had in the property, the only reasonable implication is that in fact the wife did have an interest in the property and a lien thereon was claimed." (21 Cal.2d at pp. 542-543 italics added.)

Similarly, although Seymour's memorandum created no interest in the property, did not constitute constructive notice of anything and in a legal sense was "comparable to a blank piece of paper" (see *City of Los Angeles v. Morgan* (1951) 105 Cal.App.2d 726, 733 [234 P.2d 319]), when it presented itself in the form of a recorded instrument on a title report, it was reasonably understood by third parties as an announcement by Seymour to all the world that he was claiming a 60-year leasehold interest in the premises. The record is clear that it was so read and understood, and caused Seeley damage.[5]

We conclude that it is the reasonably foreseeable effect upon prospective purchasers or lessees, not the strictly legal effect on title of a recorded instrument, which is the gravaman of a cause of action for disparagement of title under California law. We do not find the 1942 Texas case which Safeco cites appearing to hold to the contrary (*Reaugh* v. *McCollum Exploration Co.* (1942) 139 Tex. 485 [163 S.W.2d 620]) persuasive.[6]

Safeco also argues that it was "prejudiced" by the court's failure to "rule" that the memorandum was void and nonrecordable. This position is

---

[5]To illustrate how "harmless" his memorandum was, Seymour argues, at some length, that the recordation had "far less effect" on prospective purchasers than if he had recorded a lis pendens against Seeley's property, an act that would have been absolutely privileged. (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 379 [295 P.2d 405]). The fallacy of this argument is that the recording of a lis pendens would have required Seymour to initiate a lawsuit. Once Seeley successfully resisted Seymour's spurious claim in court, he would have a remedy by way of an action for malicious prosecution—assuming he could prove lack of probable cause, absence of privilege and pecuniary damage, the same elements which were required in the case at bar. Here, Seymour was able to thwart a prospective sale without first proving his claim in court. It was precisely at this form of insidious disparagement that the tort of slander of title was aimed.

[6]*Neville* v. *Higbie* (1933) 130 Cal.App. 669 [20 P.2d 348], also cited by appellants, is not on point. That case concerned a recorded real estate agency agreement that, on its face, expired after 30 days. Plaintiffs refused to state whether their loss of a prospective sale took place before or after the expiration of the agency. The *Neville* court held that no damages could reasonably have been sustained after the expiration of the instrument. The effect on prospective purchasers of an agency agreement which had already lapsed by its own terms stands on a far different footing than Seymour's recorded claim of a right to lease the property for the next 60 years.

somewhat ironic, considering that at trial Safeco argued to both the jury and the court that the document *was* recordable. To the extent that Safeco is arguing that the jury should have been instructed that the memorandum was void and unrecordable, its failure to request such an instruction precludes raising this point on appeal. (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1067 [232 P.2d 528, 728 P.2d 1163]; 7 Witkin, *op. cit. supra,* Trial § 242, p. 248.) Moreover, the jury were instructed that "[a] judge of this court . . . [had declared the Memorandum] of no force or effect against Washington and Battery Associates as evidencing any valid claim whatsoever in title to or lien against said real property." We fail to perceive any prejudice to appellants by the court's failure to elaborate on the issue further.

## IV

Although the case against Safeco proceeded to the jury on the dual theories of slander of title and general negligence, the verdict rendered did not disclose upon which theory they relied. Where no such special findings are made, the reviewing court may sustain the verdict if it is supportable on any ground. (*Everett* v. *Everett* (1984) 150 Cal.App.3d 1053, 1063 [201 Cal.Rptr. 351].) Safeco argues on appeal, as it did at trial, that, as a matter of law, it cannot be liable to Seeley for negligently recording the Seymour memorandum because it was a "mere messenger" in transmitting the document to the county recorder's office. According to Safeco, it had no more duty to prevent harm to Seeley than a private messenger or the U.S. Postal Service.

No party has cited, nor have we found, any case which directly discusses the liability of a title company, not acting as escrow agent, for the negligent recordation of a nonrecordable document. The liability of title companies when they act as escrow holders for negligence in carrying out their duties is, of course, well recognized. (E.g., *Amen* v. *Merced County Title Co.* (1962) 58 Cal.2d 528, 532 [25 Cal.Rptr. 65, 375 P.2d 33]; *Zang* v. *Northwestern Title Co.* (1982) 135 Cal.App.3d 159, 166 [185 Cal.Rptr. 176]; *Axley* v. *Transamerica Title Ins. Co.* (1978) 88 Cal.App.3d 1, 9 [151 Cal.Rptr. 570].) Equally beyond dispute is the principle that the standard of care for professionals, including title companies, is that of other professionals within their area of expertise. (4 Witkin, Summary of Cal. Law (8th ed 1974) Torts, § 518, pp. 2783-2784.)

It is now clear that a defendant can be liable for economic harm inflicted upon a third party with whom he has no direct dealing, provided that the consideration of the appropriate factors warrants the imposition of a duty to the third party. (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803-804 [157 Cal.Rptr. 407, 598 P.2d 60]; *Connor* v. *Great Western Sav.&*

*Loan Ass'n.* (1968) 69 Cal.2d 850, 865 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224]; *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685]; *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].) Those factors are: "(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm." (*Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270, 290 [175 Cal.Rptr. 767] citing *J'Aire Corp.* v. *Gregory, supra,* 24 Cal.3d at p. 804.)

First, there is little dispute that the recording of the memorandum was substantially intended to affect Seeley. Indeed, that was its primary purpose.

Second, there was a strong element of foreseeability that Seeley would suffer economic harm as the result of Safeco's recordation of Seymour's memorandum in the records of the county recorder. Once the nonrecordable memorandum found its way into the official register (with the stamp "Safeco Title Ins. Co." prominently displayed), it could reasonably be anticipated that Seeley would henceforth encounter difficulty in consummating a sale to interested third parties.

Third, there is little doubt that Seeley did in fact suffer injury. The recorded memorandum tied up his prospective sale to the Buchholz group for approximately six months and compelled him to incur attorney's fees in trying to expunge it from the record.

Fourth, the "closeness of the connection" between the act and the harm suffered is self evident. Although Safeco presented the instrument for recordation as an accommodation, the evidence strongly demonstrated that the relationship between Safeco and the county recorder as well as the circumstances under which the memorandum was presented, gave the appearance that Safeco had given its imprimatur to the document.[7]

---

[7]Safeco maintained a desk inside the recorder's office and presented their documents at a special location therein, not at the public window. Pursuant to contract with the recorder, all title company documents were stamped at a special "stopped clock" time set aside by the recorder for that purpose. By contract with the recorder, Safeco was required to review for recording compliance all documents which were recorded in this manner. In violation of its agreement with the recorder, Safeco did not stamp the document "For Accommodation Only" or place it in the basket set aside by the recorder for accommodation recordings, but instead submitted it without special identification at the "stopped clock" time along with 10 insured documents.

While not morally repugnant, Safeco's conduct is deserving of moral blame. By violating both its contract with the recorder and standard title company practices, Safeco gave the document an aura of presumptive validity, thereby dramatically increasing the likelihood that the document would not be given normal scrutiny by the recorder. (See fn. 7, *ante.*)

Finally, the imposition of liability in this instance will serve the public interest. As noted in *Akin* v. *Business Title Corp.* (1968) 264 Cal.App.2d 153, 158 [70 Cal.Rptr. 287]: " '[W]ith the increasing size of business enterprises, their pervasive effect on all aspects of life, and the close association between business and government, there is an increasing tendency to view enterprises which in the past were looked on as merely private as today having a public character.' [Citation.] Escrow companies, at least in the State of California, have such a pervasive effect on the economic life of our citizens that they have to some degree taken on a public character." Those words, written almost 20 years ago, are even more appropriate today. Title companies participate in the vast majority of real estate transactions in this state. As institutions charged with the public trust, it is important that they be held accountable when their negligent acts result in economic harm to individual property interests.

We conclude that Safeco owed Seeley a duty of care under the facts of this case, and that the jury verdict impliedly finding Safeco liable for a breach of that duty, was not erroneous as a matter of law.[8]

V

Safeco next takes exception to that portion of the judgment which allows the City to obtain partial indemnity from Safeco if the amount it pays Seeley exceeds its proportionate percentage of liability as found by the trial court.

Safeco does not directly challenge the sufficiency of the evidence to support the trial court's determination that it was 5 percent at fault and the 3 three percent. Safeco simply asserts that it cannot be liable for partial indemnity because the City (i.e., county recorder) had a "nondelegable duty" to inspect Seymour's memorandum for recordability. Safeco maintains that

---

[8]In its petition for rehearing Safeco argues that establishment of its liability for negligence in this case would amount to implicit recognition of the heretofore unknown tort of "negligent slander of title." This implication is unwarranted. It is clear that Safeco's negligence liability did not, as it claims, arise solely from the recordation of the document. Our decision stands for nothing more remarkable than that Safeco's duties of care as a title company imbued with the public's trust do not vanish into thin air simply because it does not receive a fee for its services.

a judgment permitting the City to obtain partial indemnity from Safeco improperly "shifts liability" away from the recorder for breach of this nondelegable duty.[9]

We do not quarrel with the proposition advanced by Safeco that the recorder had a statutory duty to review all documents for recordability under the Government Code. Government Code section 27203, subdivision (b) makes the recorder liable to the party aggrieved for damages occasioned by recording "any instrument . . . negligently . . . or in any manner other than that prescribed by this chapter." Seymour's memorandum did not qualify for recording under that chapter because it was not signed by the party whose property was affected. (Gov. Code, § 27288.)[10] To say that this responsibility is "nondelegable" is a shorthand way of saying that the City could not escape liability altogether by delegating this duty to someone else, such as an independent contractor. (See generally 4 Witkin, Summary of Cal. Law, *op. cit., supra,* § 663, p. 2942-2943.) We see nothing inconsistent with this concept in the imposition upon Safeco of a separate but concurrent duty to inspect the instrument for recordability before presenting it to the recorder for special recordation under the circumstances present here. The mere fact that one defendant's liability is created by statute and the other's judicially does not, of itself, give the former comparative indemnity rights superior to the latter, or alter the status of either one as joint and several tortfeasors under *American Motorcycle Assn.* (AMA) v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]. (See *City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869, 874-877 [171 Cal.Rptr. 764].) Nor is there any reason to make substantive distinctions between private and governmental defendant entities for comparative indemnity purposes. (*City of Sacramento, supra,* at p. 877.) ▮ "[A] concurrent tortfeasor is liable for the whole of an indivisible injury whenever his negligence is a proximate cause of that injury." *AMA* v. *Superior Court, supra,* 20 Cal.3d at p. 588.) "Whatever the nature of the relative faults, whatever the quantum, it is measurable under *AMA.*" (*City of Sacramento* v. *Gemsch Investment Co., supra* 115 Cal.App.3d at p. 876.)

Since the court determined that both Safeco and the City are entitled to full indemnity from Seymour, the partial indemnity rights between them would come into play only if Seymour is judgment proof. In that event, the

---

[9]Safeco also argues that it is immune from partial indemnity liability because it committed no tortious act. This argument was disposed of in the previous section of this opinion.

[10]Government Code section 27288 reads as follows: "*If the instrument is an agreement for* sale, *lease,* option agreement, deposit receipt, commission receipt, *or affidavit which quotes or refers to an agreement for* sale, *lease,* option agreement, deposit receipt, commission receipt, or lease *and such instrument claims to, or affects any interest in real property, it shall be executed* and acknowledged or proved as provided in Section 27287 *by the party who appears by the instrument to be the party whose real property is affected* or alienated thereby." (Italics added.)

two defendants would be obligated to make up any shortfall pro portionate to their degree of fault (5/8 to Safeco and 3/8 to the City) and each would be able to look to the other for any amounts paid in excess of this ratio. (*Lyly & Sons Trucking Co.* v. *State of California* (1983) 147 Cal.App.3d 353, 357-358 [195 Cal.Rptr. 116]; *Paradise Valley Hospital* v. *Schlossman* (1983) 143 Cal.App.3d 87, 94 [191 Cal.Rptr. 531].)

## VI

### *Compensatory Damages*

 Both Safeco and Seymour contend that the compensatory damage award was excessive as a matter of law. We agree.

As the result of the recorded memorandum, Seeley's sale to the Buchholz group, which could have closed as early as July 9, 1981, was held up until February 16, 1982.

Because some of the delay was at Seeley's own request, counsel conceded at trial that he was only claiming damages for delay from July 9, 1981 to January 6, 1982, a period of approximately six months.

Seeley's counsel sought compensatory damages, broken down as follows:

| *Damage Item* | *Amount* |
|---|---|
| 1. Attorney fees incurred in "removing the cloud" from date of discovery (1/27/81) to date of expungement (12/22/82) | $44,293.91 |
| 2. 80 days of inconvenience and lost time spent meeting with lawyers (eight hours per day at $110 per hour) | $70,400.00 |
| 3. General damages for inconvenience | $70,000.00 |
| 4. Loss of interest on net sale proceeds ($678,542.72 multiplied by the money market rate for six months, less adjustments) | $61,691.75 |
| TOTAL | $246,385.66 |

The jury returned with a verdict of $200,000, or 81 percent of the damages Seeley requested.

■ In an action for wrongful disparagement of title,[11] a plaintiff may recover (1) the expense of legal proceedings necessary to remove the doubt cast by the disparagement, (2) financial loss resulting from the impairment of vendibility of the property, and (3) general damages for the time and inconvenience suffered by plaintiff in removing the doubt cast upon his property. (Rest., Torts § 633; *Wright* v. *Rogers* (1959) 172 Cal.App.2d 349, 366-367 [342 P.2d 447]; *Forte* v. *Nolfi, supra,* 25 Cal.App.3d 656, 686, fn. 10; *Davis* v. *Wood* (1943) 61 Cal.App.2d 788, 799 [143 P.2d 740].) A plaintiff may *not* recover damages for emotional distress (Rest., Torts, § 633, com. (h); Rest.2d Torts, § 633, com. (j)) or for the loss of advantageous use of the money which would have been realized from the sale of the property. (*Earp* v. *Nobmann, supra,* 122 Cal.App.3d 270, 287; Rest.2d Torts, § 633, com. (i); Rest., Torts § 633, com. (g).)

■ Seeley did not prove that he suffered any financial loss from "impaired vendibility" of the property. What counsel argued under the guise of "impairment of vendibility" was the *interest* Seeley would have earned had he consummated the sale six months earlier and placed the proceeds in a money market account. Such damages are equivalent to loss of use of sale proceeds, which are not permitted because they are too speculative, since they depend upon the particular situation of the disappointed vendor and the varied possibilities as to what use the money might have been put. (See Rest., Torts, § 633 com. (g)). The present case is a good example—as the result of the delay in consummating the sale, Seeley was deprived of the ability to invest the money right away, but at the same time he realized beneficial tax consequences. Item 4 requested by Seeley ($61,691.75) is thus not supportable.

Item 3, Seeley's "inconvenience" damages ($70,000) is similarly improper. In his closing argument Seeley's counsel generously computed "time and inconvenience" damages (*Wright* v. *Rogers, supra,* 172 Cal.App.2d at pp. 366-367) at 80 days multiplied by 8 hours a day at the rate of $110, or $70,400. Counsel then took this figure and asked that the jury add an equivalent amount ($70,000) to compensate Seeley for worry, disruption of his family life, etc. These damages were thus either duplicative of "time and inconvenience" damages or indistinguishable from emotional distress damages; in either event they were nonrecoverable.

Although attorney fees and litigation expenses reasonably necessary to remove the memorandum from the record were recoverable, those incurred merely in pursuit of damages against Seymour and the other defendants were

---

[11]Safeco did not request, nor did the court give, instructions on a separate measure of damages in the event the jury found Safeco liable strictly on a theory of negligence.

not. (4 Witkin, Summary of Cal. Law, *op. cit., supra,* § 901, pp. 3187.) Nor was Seeley entitled to legal fees incurred in negotiations with third parties over sale or lease of the property. Seeley's proof of litigation expenses consisted of submitting a series of attorney billings from four different lawyers over the period from April 7, 1981 to January 3, 1983, without any segregation as to the nature of the services. Of the total attorney fees figure of $44,293.91, only $11,781 was supported by the testimony of an attorney verifying that it was directly attributable to removing the disparagement.

Because approximately two-thirds of the $240,000 damages requested were improper, there is little doubt that the $200,000 verdict brought in by the jury was excessive as a matter of law and must be reversed. Moreover, as we shall see, the enormity of the punitive damage award created a strong probability that the compensatory damage award was influenced by passion and prejudice rather than an objective weighing of the evidence.

## VII

### *The Punitive Damage Award*

Seymour and Safeco also assert that the award of $2.66 million in punitive damages against Seymour was unjustifiably excessive under the facts of this case.

We do not conclude that Seymour's conduct did not justify a punitive damage award. Punitive damages may be awarded in a slander of title action where fraud, oppression or malice is shown by the evidence. (Civ. Code, § 3294, subd.(a); *Wright* v. *Rogers, supra,* 172 Cal.App.2d 349, 368; *Spencer* v. *Harmon Enterprises, Inc.* (1965) 234 Cal.App.2d 614, 626 [44 Cal.Rptr. 683].) There was ample evidence for the jury to infer that, in recording the memorandum, Seymour acted with "conscious disregard of the plaintiff's rights." (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].)

However, it is the duty of an appellate court to intervene "in instances where punitive damages are so palpably excessive or grossly dispro-portionate as to raise a presumption that they resulted from passion or prejudice." (*Burnett* v. *National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1011 [193 Cal.Rptr. 206, 49 A.L.R.4th 1125]; see also *Rosener* v. *Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740, 749-750 [168 Cal.Rptr. 237]; *Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P2d 39].)

There is no shortage of California case law dealing with the subject of excessive punitive damage awards. The Fourth District Court of Appeal in

*Devlin* v. *Kearny Mesa AMC/Jeep Renault, Inc.* (1984) 155 Cal.App.3d 381, 393-396 [202 Cal.Rptr. 204] has taken the trouble to compose a table of just 16 recent examples showing the various factors involved and tracing the history of each case through its ultimate disposition on appeal. As the *Devlin* court notes, the only clear impression one receives from examining these cases is that the courts do not adhere to a rigid or fixed formula for determining excessiveness. (155 Cal.App.3d at p. 388.)

 Nevertheless in *Neal* v. *Farmer Ins. Exchange, supra,* 21 Cal.3d 910, the California Supreme Court has handed down certain guiding principles for assessing punitive damage awards: "One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility; and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. (See *Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, 65; *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal. App.3d 376, 408-409; (see fn. 13, *ante*); *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 352-353 [87 Cal.Rptr. 226].) Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence (see fn. 13. *ante*), will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. (See *Bertero, supra,* at p. 65; *Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 937 [119 Cal.Rptr. 82]; *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 [95 Cal.Rptr. 678]; *Ferraro* v. *Pacific Fin. Corp., supra,* 8 Cal.App.3d 339, 353; *MacDonald* v. *Joslyn* (1969) 275 Cal.App.2d 282, 293-294 [79 Cal.Rptr. 707, 35 A.L.R.3d 641].) By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (21 Cal.3d at p. 928)

 Analyzing the first factor, there is sufficient justification for characterizing Seymour's conduct as "reprehensible." This was apparently not the first time he had used the recording of a sham document to interfere with another's property rights, solely for pecuniary gain. However, the parties here were sophisticated businessmen of relatively equal bargaining strength. The situation at bar thus carries a lesser degree of "reprehensibility" than the more typical punitive damage case where a large or sophisticated business enterprise uses its wealth or power to exploit the weak or the unwary. (e.g., *Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610 [197 Cal.Rptr. 878]; *Godfrey* v. *Steinpress* (1982) 128 Cal.App.3d 154 [180 Cal.Rptr. 95]; *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155

Cal.App.3d 381; *Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982 [149 Cal.Rptr. 119].) We are aware of no case where even a six, let alone seven, figure punitive damage award against a private individual has been upheld, regardless of the reprehensibility of the conduct. The colossal size of the jury's punitive award for what amounts to unethical business tactics creates the inevitable inference that it was the product of antipathy toward the defendant, rather than the gravity of his wrongful conduct. (See *Goshgarian* v. *George* (1984) 161 Cal.App.3d 1214, 1229-1230 [208 Cal.Rptr. 321]; *Cunningham* v. *Simpson, supra,* 1 Cal.3d at p. 310.)

The second factor is the relationship between the amount of the award and the actual harm suffered. In this case, the ratio of compensatory to punitive damages was 13.3 to 1. In *Forte* v. *Nolfi, supra,* 25 Cal.App.3d 656, 686-689 also a slander of title action, a $20,000 punitive award was stricken where the maximum recoverable compensatory damages totalled no more than $2,800. (25 Cal.App.3d at p. 688.) Thus, even were the compensatory damages awarded fully justified by the evidence in this case, which they were not, (see section VI of this opinion, *ante*) the punitive damage award here would be suspect.

Perhaps just as important as the mathematical ratio between the punitive damage award and compensatory damages, however, is the relationship between the size of the award and the *nature* of the harm suffered. In the instant case, Seeley was able to sell his property at a handsome profit in a rapidly rising real estate market. Seymour's recorded memorandum created merely a temporary obstacle toward completion of the sale. Certainly the type of harm suffered here does not approach that in *Burnett* v. *National Enquirer, Inc., supra,* 144 Cal.App.3d 991 , where a considerably wealthier defendant held up a respected celebrity to contempt and ridicule by falsely portraying her as a bumbling inebriate. The *Burnett* court nevertheless struck down a punitive damage award of $750,000 as unjustified. (*Id.,* at p. 1011) Nor does the harm compare to that in *Merlo* v. *Standard Life & Accident Ins. Co. of Calif.* (1976) 59 Cal.App.3d 5 [130 Cal.Rptr. 416], where an insurance company, in bad faith, withheld plaintiff's disability payments, resulting in the foreclosure of his home and the eviction of his family from their residence. The *Merlo* court reversed a $500,000 punitive damage award as "presumptively based upon passion and prejudice." (59 Cal.App.3d at p. 18.)

We are compelled to conclude that the imposition of a two and a half million dollar penalty for making Seeley wait six months longer than he wanted to close a lucrative land sale was ineluctably an act of passion or prejudice on the part of the jury. Such an award can well be characterized as greatly exceeding the level necessary to properly "punish and deter" in light of the actual harm suffered. (*Neal* v. *Farmers, supra,* 21 Cal.3d at p. 928.)

Because consideration of the first two factors convinces us that the punitive damage award cannot stand, it is unnecessary to engage in a detailed assessment of the third factor, i.e., the wealth of the defendant. It is noteworthy, however, that awards totalling more than 10 percent of a defendant's net worth have been disfavored by our courts (*Goshgarian* v. *George, supra,* 161 Cal.App.3d at p. 1228 and cases cited therein) and that the award at bar constituted approximately *200* percent of Seymour's current net worth according to the only evidence produced at trial.

In view of the excessiveness of the damage awards, we may (1) order a new trial on all issues, (2) order a new trial on the issue of damages alone, or (3) issue a remittitur conditioning affirmance of the judgment for plaintiff on plaintiff's agreement to accept a lesser award. (*Zhadan* v. *Downtown L. A. Motors* (1976) 66 Cal.App.3d 481, 502-503 [136 Cal.Rptr. 132]; *Cunningham* v. *Simpson, supra,* 1 Cal.3d at p. 310.)

We choose the second option. The evidence conclusively supported the liability of appellants and is clearly severable from the damage issues. On the other hand, the palpably gross excessiveness of both the compensatory and punitive damage awards require a fresh assessment of damages from a new trier of fact.

### Disposition

The judgment is reversed. The cause is remanded to the superior court for a new trial on the issue of damages and for proceedings not inconsistent with the views expressed herein. Each party shall bear its own costs on appeal.

Kline, P. J., and Rouse, J., concurred.

Petitions for a rehearing were denied April 27, 1987, and the opinion was modified to read as printed above. The petitions of appellant Safeco Title Insurance Group and respondent Seeley for review by the Supreme Court were denied July 1, 1987.

APPENDIX

SAFECO TITLE INS. CO.

8034357

1978 OCT 17 PM 1:08

AN FRANCISCO, CALIF.
THOMAS P. KEARNEY
RECORDER

LIBER C659 PAGE 676

When Recorded Mail To:

B.A. Seymour
P.O. Box 75
San Rafael, CA 94901

LIBER C659 PAGE 676

MEMORANDUM OF AGREEMENT

PARTIES: An agreement was entered into by and between BRUCE A. SEYMOUR as Lessee and RICHARD SEELEY of Market Insight Corporation as Lessor.

PROPERTY: Assessor's Block 206, Lot 16, City of San Francisco, A/K/A So. W. corner of Battery and Washington Streets.

CONSIDERATION: Ground rent of $2000 per month net, net, net for the first three years and thereafter as adjusted by use of the agreed upon index.

TIME: Ground rent to commence 120 days from date.

TERM: Ground lease shall be for a period of (60) years.

TITLE: Lessor shall retain title to the fee, Lessee shall retain title to the improvements.

ASSIGNABILITY: Assignment may only occur with the expressed written consent of the parties hereto. Consent shall not be unreasonably withheld.

PURCHASE OPTION: Lessee may purchase the fee in the 18th year of the ground lease at a price determined by adding the increase in the C.P.I. to $260,000.

NOTICES: As to Lessor: Mr. Richard Seeley
Market Insight Corporation
1900 Powell Street #700
Emeryville, CA 94608

As to Lessee: Mr. Bruce A. Seymour
P.O. Box 75
San Rafael, CA 94901

Bruce A. Seymour, Lessee
Dated: August 30, 1978

State of California
County of Marin

— ACKNOWLEDGMENT—General —

On this 13th day of September . . A.D. 1978 before me.
_____ a Notary Public in and for the said County and State, residing therein, duly commissioned and sworn, personally appeared _____ Bruce A. Seymour _____
known to me to be the person whose name is subscribed to the within Instrument, and acknowledged to me that he executed the same.
In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

_____ Notary Public in and for said County and State of California
My Commission Expires _____

OFFICIAL SEAL
LYNN ANN SLOAN
NOTARY PUBLIC - CALIFORNIA
COUNTY OF MARIN
My Commission Expires Feb 14 1981

FORM GA—SAM HOPKINS LEGAL FORMS PRINTING SERVICE, 3333 FRUITVALE AVE., OAKLAND, CA, PH.