[Civ. No. 22261. Fourth Dist., Div. One. Dec. 12, 1980.]

GUY O. HOWARD et al., Plaintiffs and Respondents, v.
JOHN J. SCHANIEL et al., Defendants,
Cross-complainants and Respondents;
JAMES L. ARBAUGH, Defendant, Cross-defendant and Appellant;
MANUEL P. SILVA et al., Cross-complainants and Respondents.

COUNSEL

Curto, McKinley & Brewer and Jon F. McKinley for Defendant, Cross-defendant and Appellant.

Lee M. Woodland for Plaintiffs and Respondents.

No appearance for Defendants, Cross-complainants and Respondents.

Ralph Gano Miller and Thomas M. Monson for Cross-complainants and Respondents.

OPINION

COLOGNE, J.—Guy O. and Estelle Howard (Howards) brought an action for quiet title seeking to resolve their claim of adverse possession on certain real property and sought damages against James L. Arbaugh for slander of title. Cross-complainants Manuel P. and Louise C. Silva (Silvas) also sought damages against Arbaugh for fraud, negligent misrepresentation and indemnity; similarly, cross-complainants John J. and Genevieve Schaniel (Schaniels) sought damages against Arbaugh for fraud, breach of contract, breach of covenant the property was free of encumbrances and negligent misrepresentation. Howards commenced this action after Arbaugh, acting as real estate broker for Silvas, participated in a transaction culminating in a sale of Silvas' real property of record to Schaniels in 1973. The quiet title aspects of this action determined that in 1959 Howards had acquired title by adverse possession to, and an easement by prescription upon, a portion of the real property involved in the Silva-Schaniel sale. There is no question on this appeal as to the propriety of the decree quieting title. The trial court awarded damages to Howards on their slander of title count; to Silvas for "slander of title, intentional invasion of interests in property, and willful

misrepresentation"; and to Schaniels for "intentional invasion of property interest and intentional misrepresentation." Arbaugh appeals the portion of the judgment which awarded the ($13,382) damages against him. The bulk of the sums awarded, $4,000 to Howards, $6,000 to Silvas and $2,000 to Schaniels, represents attorneys' fees incurred in connection with the same action, limited in Howards' case to attorneys' fees in the quiet title aspects of Howards' action.

For about 20 years before 1973, Howards and Silvas owned adjoining rectangular lots each extending east-west approximately 208 feet and north-south 50 feet according to all available legal descriptions of record. When the lots were first purchased, Mrs. Cornelius, the seller, reserved a 10-foot easement for road and utility purposes along the west end of both lots and bulldozed a roadway there giving the properties access to Sage Road several hundred feet to the north. Mrs. Cornelius also drove stakes in the ground along an embankment at the west edge of the bulldozer's roadway and told the owners the stakes marked the western boundary line of their lots. The 208 feet legal description in the deeds, however, left the record description of the lots' western boundaries 43 feet short of the stakes. Of record, this 43- by 100-foot area, the parcel of concern in the case, was acquired from Mrs. Cornelius by Caryl L. and Miriam Picotte (Picottes) who believed, as did Howards and Silvas, the latter two owned it.

In the meantime, with Mrs. Cornelius' assistance in staking, the Silvas' west-facing home was located at the extreme west end of their lot of record so that its eaves overhung the property line at the 208 feet mark and its living room was the site of the road and utility easement Mrs. Cornelius had reserved. Also during that time, Howards built their home in the eastern half of their lot but did all things necessary to establish prescriptive and adverse title to the 43 feet by 50 feet disputed parcel to the west and the easement over it.[1] In 1967, Howards built a north-south wall at about midpoint of their lot, thus cutting off ready access to the western half from their east-facing house. In 1968, they had a water tank removed, and after that cleared the western half but made little use of it other than for crossing over it by foot.

---

[1] The trial court found Howards' use of the disputed parcel during nearly 20 years continued "openly, notoriously, continuously and uninterruptedly. . . at will, as if it were their own"; and they paid the property taxes. During that same period, Howards similarly used "at will, openly, notoriously, continuously and uninterruptedly, for purposes of ingress and egress to their deeded property and to the disputed parcel," and without seeking or obtaining expressed consent from the underlying fee owners the dirt roadway

In early 1973, Silvas decided to sell their property and contacted their longtime friend and real estate broker Arbaugh for that purpose. At about the same time, Picottes' real estate agent notified Arbaugh of the boundary line discrepancies. Arbaugh was derogatory, telling the agent she was "making waves" and indicating they could have ignored the discrepancy and forgotten about it. Nevertheless, Arbaugh investigated and began measuring the property. While he was on the disputed parcel, Mrs. Howard saw him and asked what he was doing. He told her, then said the property was not what it was supposed to be. Mrs. Howard differed with him and described her property line and easement on the disputed portion. Arbaugh told her she was wrong, the property belonged to Picottes, but he would check it out and let her know. He did not contact Howards again about the property.

Arbaugh secured for the Schaniels a conveyance of an easement from Sage Road to the Silva-Schaniel property. With knowledge of Howards' claim of title and right, Arbaugh went to Mrs. Picotte and arranged for the sale of the disputed 43 by 100 feet parcel from Picottes to Silvas. He also arranged for the parcel to be conveyed from Silvas to Schaniels who were unaware of Howards' claim of ownership. He then arranged for the deeds for these two transactions to be recorded.

The court found that in arranging these conveyances and in recording the deeds, Arbaugh was not acting in good faith; and in conducting the transactions he had represented to Schaniels that Picottes, and later Silvas, had been the true owners; and this representation of title was disparaging to and cast a cloud upon the claim of title asserted by Howards, without privilege, good faith, or justification. Moreover, the court found that in performing these acts, Arbaugh acted on his own behalf, without the knowledge of the Silvas and not in the Silvas' best interests; in so doing, he willfully misrepresented the rights and titles of the parties to the Silvas; and he willfully failed to advise Schaniels of the Howards' claim of title to the disputed parcel and easement access described above; and in so doing, intentionally misrepresented the status of that claim to Schaniels.

---

which connected the west end of their property to Sage Road, thus acquiring prescriptive title to an easement along it, effective since at least 1959.

Moreover, the trial court applied the agreed boundary line doctrine based on acquiescence and an implied agreement between Picottes and Howards to establish the western boundary line of Howards' lot as it was staked by Mrs. Cornelius (see 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 109 et seq., p. 1857 et seq.).

As a result, Howards were found to have been damaged for disparagement of their title in the sum of $4,000 by way of reasonable attorneys fees in the quiet title causes of action, exclusive of fees for prosecuting the slander of title cause of action, and were also entitled to costs against defendants James L. Arbaugh and John J. Schaniel and Genevieve Schaniel, in the sum of $698.18, and costs in the additional sum of $216.09 against defendant James L. Arbaugh alone; Schaniels were damaged by cross-defendant Arbaugh in the sum of $2,000 by way of reasonable attorneys' fees in this action, plus costs of suit in the amount of $468; and Silvas were damaged by cross-defendant Arbaugh in the sum of $6,000 by way of reasonable attorneys' fees in this action.

The money judgment in Howards' favor was for slander of title which Howards pleaded in their amended complaint. The court entered the judgment in Silvas' favor for slander of title and intentional invasion of interests in property, neither of which was pleaded in their cross-complaint and for willfull misrepresentation as pleaded in their cross-complaint.

The money judgment in Schaniels' favor was for intentional invasion of property interest which they did not plead, and intentional misrepresentation as pleaded in their cross-complaint.

Arbaugh contends he could not properly be found to have committed slander of title because title by adverse possession is not within the scope of the slander of title doctrine, his actions were privileged and he did not publish a slanderous statement. As we shall discuss, there is merit to his first two assertions, even assuming the acts he "arranged" constituted a publication, and we reverse the money judgment as it favors the Howards.

█ The question of whether slander of title can be applied to a title acquired by adverse possession but as yet not established by decree, has not been decided in the state. For several reasons, we hold such an application is unavailable particularly where, as here, the adverse title was acquired long before the alleged slander of title occurred and a substantial time period of apparent nonuse of the property in question has preceded as well as included the date of the alleged slander of title.

California has adopted the definition of slander of title set forth in section 624 of the Restatement of Torts reading as follows: "One who,

without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused." (See *Gudger* v. *Manton* (1943) 21 Cal.2d 537, 541 [134 P.2d 217] (disapproved on other grounds in *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 381 [295 P.2d 405]).)

Another statement of definition of the tort, perhaps more pertinent to the facts of this case, is to be found in *Fearon* v. *Fodera* (1915) 169 Cal. 370, at pages 379 and 380 [148 P. 200], as follows: "'Slander of title,' as recognized by the law, may be defined to be defamation of title to property, real or personal, by one who falsely and maliciously disparages the title thereto, and thereby causes the owner thereof some special pecuniary loss or damage. [Citations.] Admittedly under this definition slander of title may be committed by maliciously clouding the title to real property and causing damage to the owner thereof by the execution, willful acceptance, and malicious recordation of a deed which falsely declares the title of the property involved to be in a person other than the true owner. In short an action for slander of title may be based upon defamatory words contained and published in an executed deed. It is essential, however, to the maintenance of such an action that the party claiming to be aggrieved by an alleged slanderous disparagement of his title should show, among other things, not only that the statements complained of were false, but that they were maliciously made with the intent to defame and thereby disparage the title involved. In other words, malice, express or implied, in the making of slanderous statements is an essential ingredient of a cause of action for damages for slander of title, without proof of which such action must fail. [Citations.]"

■ Sections 623A, 624 and 633 of the Restatement Second of Torts further refine the definition[2] so it is clear included elements of the tort

---

[2]Sections 623A, 624 and 633 of the Restatement Second of Torts, read as follows: "§ 623A. Liability for Publication of Injurious Falsehood—General Principle. One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if [¶] (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and [¶] (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity."

"§ 624. Disparagement of Property—Slander of Title. The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of a

are that there must be (a) a publication (§ 623A, subd. (a)), (b) which is without privilege or justification and thus with malice, express or implied (*Gudger* v. *Manton, supra,* 21 Cal.2d 537, 544; *Fearon* v. *Fodera, supra,* 169 Cal. 370, 380-381), and (c) is false, either knowingly so or made without regard to its truthfulness (§ 623A, subd. (b)), and (d) causes direct and immediate pecuniary loss (§§ 623A, com. (f), 633, com. (k)).

Several of these elements are missing in the case before us. Moreover, the adverse title alleged to have been slandered here is not susceptible to the application of the doctrine. Speaking to the latter point first, we emphasize protection from injury to the salability of property is the thrust of the tort (see *Smith* v. *Stuthman* (1947) 79 Cal.App.2d 708, 709 [181 P.2d 123]).

■ A title acquired by adverse possession is not a marketable title until the title is established by judicial proceedings against the record owner (see Bowman, Ogden's Revised Cal. Real Property Law, § 4.6, p. 120). In addition, as stated in 3 Miller and Starr, California Real Estate, section 19.1, at page 395: "The burden of proving title by adverse possession is upon the occupant. It is presumed that the person holding the record legal title is the owner of the property and in possession and therefore the adverse possessor must prove each of the statutory elements of adverse possession in order to establish his title. [Fn. omitted.] If he does so, the burden of proof shifts to the record owner to disprove the claimant's title."

■ Until the proceedings here, neither Howards nor Silvas had established their title to the disputed parcel. Accordingly, the presumption of ownership in the record owner, Picottes, applied. It follows, whether one categorizes the missing element as involving a lack of

false statement disparaging another's property rights in land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property."

"§ 633. Pecuniary Loss. (1) The pecuniary loss for which a publisher of injurious falsehood is subject to liability is restricted to [¶] (a) the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement, and [¶] (b) the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement.

"(2) This pecuniary loss may be established by [¶] (a) proof of the conduct of specific persons, or [¶] (b) proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify."

malice or a lack of falsity of the publication, Arbaugh cannot be held accountable in the tort of slander of title for arranging the conveyances reflecting the record title here. The presence of the adverse title alone, even in the face of a claim of right by the Howards, is not enough to found a slander of title tort. A condition precedent to committing this tort was a judicial proceeding establishing of record the title by adverse possession. That was not done here, and so the Howards' and Silvas' judgments based on slander of title must fail on this basis alone.

Having reached this conclusion, it is not necessary to address other elements of the tort as applied to this case. We can say, however, the "publication" involved here appears to have been made under cover of privilege by virtue of the authority of Civil Code section 1047, which reads: "Any person claiming title to real property in the adverse possession of another may transfer it with the same effect as if in actual possession."

In *Lucas* v. *Pico* (1880) 55 Cal. 126, the court found there was no wrongdoing in giving information about an outstanding title to land which is in the adverse possession of another or in rendering services in the acquisition of such a title. Citing Civil Code section 1047, the court in *Lucas* held participating "in any capacity, whether as principal or as agent, or broker, in a transaction for obtaining a transfer of title to land in that condition [subject to a claim of title by adverse possession] . . . is authorized by law . . . [and] is neither *malum in se* nor *malum prohibitum*" (*Lucas* v. *Pico, supra*, 55 Cal. 126, 128-129). Going one step further, we find that participation in such a transaction, specially authorized by statute, is privileged and the presence of good faith in making such a publication is not essential.

In addition, since Howards did not have a marketable title to the disputed parcel when Arbaugh committed the acts complained of, it can hardly be said those acts impaired the immediate salability of the Howards' interest or put the property under any cloud that did not already exist. Howards cannot show the acts of Arbaugh have slandered the title.

Our conclusion about slander of title applies to both Howards and Silvas. ▪ Silvas could not have had their slander of title judgment affirmed in any event since it was not pleaded. The rule is that a plaintiff must recover, if at all, upon the cause of action set out in the complaint, and not upon some other which may be developed in

the proof (*Kredo* v. *Phelps* (1904) 145 Cal. 526, 528-529 [78 P. 1044]). None of the exceptions relating to immaterial variances between pleading and proof and amendments to conform to proof applies here (see 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 1056 et seq., p. 2631 et seq.; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 302, pp. 4285-4286). The slander of title judgment in favor of Silvas thus fails.

The same analysis applies to the judgment in favor of both Silvas and Schaniels, respectively, for "intentional invasion of interests in property" and "intentional invasion of property interest," assuming such a cause of action exists in the law of torts.[3] The judgment on this account in Silvas' and Schaniels' favor must be reversed as well.

■ Finally, on the judgment for misrepresentation in favor of Silvas and Schaniels, the primary damages assessed, as we have seen, were attorneys' fees and costs in connection with this legal controversy. Authority for doing so is the following passage from *Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, at page 620 [30 Cal.Rptr. 821, 381 P.2d 645]: "*General rule*: In the absence of some special agreement, statutory provision, or exceptional circumstances, attorney's fees are to be paid by the party employing the attorney. (Code Civ. Proc., § 1021; citations.)

"*Exception*: A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred. [Citations.]"

The language of the exception, read literally, appears to justify the measure of damages. However, the applicability of the *Prentice* language was narrowed in the recent case of *Davis* v. *Air Technical Industries, Inc.* (1978) 22 Cal.3d 1 [148 Cal.Rptr. 419, 582 P.2d 1010], in which the court said (at p. 7): "[T]he *Prentice* exception was not meant to apply in every case in which one party's wrongdoing causes another to be involved in litigation with a third party. If applied so broadly, the judicial exception would eventually swallow the legislative

---

[3]In making such an assumption, we wish to emphasize we give no credence to the idea such an action exists. Silvas' argument the quoted tort consists of a combination of trespass and nuisance is without authority.

rule that each party must pay for its own attorney. [Fn. and citations omitted.] To avoid this result, *Prentice* limits its authorization of fee shifting to cases involving 'exceptional circumstances.' [Citation.]"

Indeed, the *Davis* case has been read, and we think properly, to have confined *Prentice* to its own facts (see *Harbor City Discount Auto Center, Inc.* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 886, 891 [157 Cal.Rptr. 438]). The facts in *Prentice* were that a paid escrow holder "negligently made it necessary for the vendor of land to file a quiet title action against a third person," thus entitling the vendor to attorneys' fees damages against the escrow holder (59 Cal.2d 618, at p. 621). Those facts, and particularly the causative aspect, are not present in Silva's case because Silva would have had to pursue a quiet title action in any event. Accordingly, the *Prentice* exception to the general rule that one pays his own attorneys' fees does not apply to Silvas. Theirs is not an "exceptional" case in which Arbaugh's representations "made it necessary" for them to protect their interests by bringing the action against third parties. As to Silvas, the attorneys' fees measure of damages is improper here and the judgment based on misrepresentation likewise must be reversed.[4]

■ Keeping in mind application of the *Prentice* exception is made on a case-by-case basis and will be applied only where, among other things, we are dealing with "separate litigation brought about by the wrongdoing of the ultimate single tortfeasor" (see *Trails Trucking, Inc.* v. *Bendix-Westinghouse etc. Air Brake Co.* (1973) 32 Cal.App.3d 519, 524 [108 Cal.Rptr. 30]; and see *Walters* v. *Marler* (1978) 83 Cal. App.3d 1, 29-30 [147 Cal.Rptr. 655]), we find Schaniels' case to be different from Silvas' and to fall within the narrow *Prentice* exception allowing the attorneys' fees measure of damages. Schaniels bargained for title free and clear of any adverse claims. However, as a direct result of Arbaugh's willful failure to advise them of Howards' claim when combined with his direct representation that Picottes, then Silvas, owned the parcel, Schaniels found themselves in the midst of this expensive litigation. Schaniels' circumstances are exceptional and Arbaugh stands, as to them, in a position analogous to the escrow holder in *Prentice*. Schaniels' involvement in this action could have been avoided if Arbaugh had disclosed the facts and the quiet title action had been pursued by Silvas prior to the sale. Accordingly, the attorneys'

---

[4]Insofar as Arbaugh asks for attorneys' fees should he prevail on this appeal, the same principles operate to prevent his entitlement to any such fees.

fees damages for Schaniels on their misrepresentation cause of action are proper.

The judgment for money damages in favor of Howards and Silvas against Arbaugh is reversed. In all other respects, the judgment is affirmed.

Brown (Gerald), P. J., and Work, J., concurred.

A petition for a rehearing was denied December 24, 1980.