Filed 1/24/14  Hussein v. Driver CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| EREN HUSSEIN,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>DAVID DRIVER et al.,<br><br>　　　　Defendants and Respondents. | A134745<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-08-483062) |

## I.

## INTRODUCTION

This lawsuit stems from ongoing disputes between owners in a condominium project located at 1570-1574 Waller Street in San Francisco (condominium project), particularly with regard to the ownership of a parking space in the garage of the building. Appellant Eren Hussein, the former owner of Unit 401, appeals after summary judgment was entered in favor of respondents, the current and former owners of Unit 301.[1] Appellant contends the trial court erred in granting judgment for respondents because triable issues of material fact existed on his allegations for slander of title, interference

---

[1] As for respondents' identities, at all times relevant to this litigation, respondents David Driver and Emelia Rallapalli resided in Unit 301, which is the unit situated directly below appellant's unit.  Respondent Driver became an owner of Unit 301 in 2008, and also became a director of the condominium project homeowner's association (HOA). Respondents Krishna and Philippine Rallapalli, who are the parents of Emelia Rallapalli, are the former owners of Unit 301.

1

with contract, and negligent and intentional interference with prospective economic advantage. We affirm the judgment.

## II.

## FACTS AND PROCEDURAL HISTORY

The condominium project is a three-unit complex that includes three parking spaces. At the center of this controversy is the disputed issue of the ownership of one of these parking spaces and how this dispute affected the marketability of one of the units in the busy Cole Valley neighborhood.[2] On November 19, 1982, Richard Crofton-Sleigh and Michele P. Crofton-Sleigh (collectively "Declarants"), who at that time owned the entire building, recorded an "Enabling Declaration Establishing a Plan for Condominium Ownership" ("Declaration") dividing the property into three separate units. Declarants also recorded an accompanying parcel map ("Map") that identified three separate condominium units as: (a) Unit 201 (located on the second floor); (b) Unit 301 (located on the third floor); and (c) Unit 401 (located on the fourth floor) and a garage on the ground floor. The Map identifies three parking spaces in the garage, namely parking spaces P-1, P-2, and P-3 and indicates these are "parking areas, easement for the exclusive use of said areas shall be granted as appurtenances of particular units."

The Declaration defines a "Common Area" as "all lands and improvements not within any Unit" and grants each Unit, as appurtenant to its property, undivided interest in the Common Areas. Such undivided interest "cannot be altered without the consent of all the Unit Owners affected . . . ." The Declaration further defines "Restricted Common Areas" as areas "set aside and allocated for the exclusive use of the Owners of the Units"

---

[2] Although it played a prominent role below, nowhere in appellant's opening brief is there any discussion or analysis of the evidence submitted by appellant below concerning "many tens of thousands of dollars of common building costs and expenses" he claimed were "wrongfully" imposed by the HOA "for the pecuniary gain of the Owners of [Unit] 301." Because issues with regard to these assessments are not before this court, we do not address them in this opinion. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [court is not required to discuss or consider points which are not argued on appeal].)

2

and that "[s]uch easements shall be appurtenant to the respective Units as granted by Declarant in the deed to the purchasers of the respective Units."

The deed for the original transfer of Unit 301 included an exclusive easement to use the parking area designated as P-2 on the map. The deed for the original transfer of Unit 201 included an exclusive easement to use the parking area designated as P-3 on the map. When appellant purchased Unit 401 in June 22, 2005, the deed to his Unit 401, and the deeds previously recorded, differed from the deeds to Unit 201 and Unit 301 because it *did not* include an easement for exclusive use of P-1, one of the three parking spaces.

On or about October 18, 2006, Meredith Martin, a real estate agent with Paragon Real Estate Group ("Paragon") listed Unit 401, owned by appellant, for sale. Martin received an email from Chicago Title Company stating that no parking space had been deeded to Unit 401 and that this omission in the deed could be corrected if the owners of Unit 201 and Unit 301 deeded parking space P-1 to appellant. Martin requested that the owners of Unit 301 and Unit 201 sign a "draft deed that would correct the omitted parking exclusive easement for this property [Unit 401]." Martin sent a draft deed which proposed to grant appellant "[a]n exclusive easement, appurtenant to and for the benefit of unit #401 to use the Parking area(s) designated as P-1 on the Map." The owners of Unit 201 agreed to execute the necessary documents, and they have never claimed any ownership interest in parking space P-1.

However, a resident of Unit 301, respondent Driver (who is an attorney) researched the deed history on all the units and summarized his findings in two emails responding to the request of appellant's real estate broker. Driver explained respondents' position that parking space P-1 was not an exclusive easement owned by appellant, but instead was legally part of the common area owned by the HOA, and therefore was available for use by any of the other owners. He also claimed appellant was not entitled to sell rights to parking space P-1 to any purchaser of Unit 401. It is undisputed that after the problem with appellant's title came to light, respondent Driver occasionally parked his vehicle in parking space P-1.

Appellant took steps to rectify the omission in the deed. He requested that the Association vote to enact a "policy" that assigned each parking space to an individual unit. Appellant also recorded a new deed from the original Declarant that attempted to retroactively grant appellant an exclusive easement to use parking space P-1. Nevertheless, appellant was unsuccessful in getting respondents to back away from their position that parking space P-1 was not owned by appellant, but instead was part of the common area owned by the HOA, and available for use by all the owners.

Appellant eventually sold Unit 401 to Gary E. Grote and Janice P. Grote (the Grotes) in early to mid-December 2008. However, appellant believed that the ongoing dispute with respondents, especially with regard to whether or not a prospective purchaser would have exclusive use of a parking space, discouraged prospective buyers and resulted in the value of the condominium being diminished.

Appellant and the Grotes filed this action in December 2008, alleging seven causes of action against respondents and the HOA. On May 28, 2009, appellant and the Grotes filed their second amended complaint, the operable complaint for purposes of summary judgment. On November 20, 2009, the seventh cause of action for quiet title to parking space P-1 was voluntarily dismissed and the HOA was dismissed as a party after the dispute over the parking space was settled.[3]

Thereafter, on April 7, 2011, respondents filed their motion for summary judgment and/or summary adjudication "to resolve the following causes of action, that are [primarily] based . . . on the same basic dispute alleged in the quiet title cause of action but that were not otherwise resolved in the settlement and remain at issue." These cause of action included: (1) appellant's and the Grotes' cause of action for slander of title; (2) appellant's cause of action for intentional interference with contractual relations; and (3) appellant's causes of action for intentional and negligent interference with prospective economic advantage.

---

[3] The terms of the settlement are confidential and do not appear as a matter of record in this appeal.

4

On March 9, 2012, the trial court entered judgment against appellant after granting respondents' motion for summary judgment. The court's grant of summary judgment disposed of all viable claims against appellant. The only cause of action in the second amended complaint that remains viable is the cause of action for trespass bought by the Grotes against respondents. Respondents' cross-complaint against the Grotes for nuisance, indemnity, and contribution also remains. At the Grotes' request, the court stayed any further action on this case pending resolution of this appeal. Appellant timely appealed from the judgment entered in respondents' favor.[4]

## III.

## DISCUSSION

### A. Standard of Review

The general standard of review of an order granting a motion for summary judgment is well settled and was recently stated by this court in *Brisbane Lodging, L.P. v. Webcor Builders, Inc.* (2013) 216 Cal.App.4th 1249. "We review a trial court's grant of summary judgment de novo. [Citation.] 'In performing our de novo review, we must view the evidence in a light favorable to [the] plaintiff as the losing party [citation], liberally construing [its] evidentiary submission while strictly scrutinizing [the] defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in [the] plaintiff's favor. [Citations.]' Summary judgment is proper 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .' [Citations.]" (*Id.* at p. 1256.)

---

[4] Although appellant describes the Grotes as additional appellants on the slander of title cause of action, the notice of appeal names only Eren Hussein as an appellant, and there has been no request to amend the notice of appeal to add the Grotes. (Compare *Beltram v. Appellate Department* (1977) 66 Cal.App.3d 711, 714.) Mistakes in designating parties will not be fatal, especially where respondents are not prejudiced or misled; however, this court has not been asked to remedy this omission. (*Id.* at pp. 715-716.)

## B. Slander of Title

The trial court found appellant did not show any probability of prevailing on the merits of his claim for slander of title. The court's written order states appellant failed to meet his burden of creating a "triable issue of fact that the individual [respondents] published a false and unprivileged disparagement of [appellant's] title to Unit 401." We agree with the trial court that the opinions expressed by respondents in connection with the parties' dispute with regard to the ownership of parking space P-1, which were not resolved until the settlement of appellant's quiet title cause of action, do not constitute false statements of fact necessary to support a claim of slander of title.

"The gravamen of an action for 'disparagement of title,' also known as 'slander of title,' . . . occurs when a person, without a privilege to do so, publishes a false statement that disparages title to property and causes pecuniary loss. [Citation]." (*Truck Ins. Exchange v. Bennett* (1997) 53 Cal.App.4th 75, 84.) Our Supreme Court has held "[i]f the matter is reasonably understood to cast doubt upon the existence or extent of another's interest in land, it is disparaging to the latter's title where it is so understood by the recipient. [Citation.]" (*Gudger v. Manton* (1943) 21 Cal.2d 537, 542-543 (*Gudger*), disapproved on another point in *Albertson v. Raboff* (1956) 46 Cal.2d 375, 381; *Hill v. Allan* (1968) 259 Cal.App.2d 470, 489 (*Hill*).) The elements of the tort are: (1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss. (*Ibid.*; *Alpha & Omega Development, LP v. Whillock Contracting, Inc.* (2011) 200 Cal.App.4th 656, 664; *Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1030.)

The critical issue is whether appellant raised a triable issue of fact with respect to the third element—that respondents' statements with respect to the ownership of parking space P-1 were false. California has adopted the definition of slander of title set forth in the Restatement Second of Torts (Restatement). (See *Howard v. Schaniel* (1980) 113 Cal.App.3d 256, 262-263 (*Howard*).) The Restatement "describes the tort of slander of title as a subspecie of the more general tort of publication of an injurious falsehood." (*Appel v. Burman* (1984) 159 Cal.App.3d 1209, 1214 (*Appel*).) The Restatement defines

6

injurious falsehood as follows: " 'One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.' . . ." (*Ibid.*, quoting Rest. 2d Torts § 623A, p. 334.)

Consequently, appellant's burden of proof is " 'the same test as that for scienter in the tort of deceit,' " requiring that respondents " 'know that the statement is false or acts in reckless disregard of its truth or falsity.' " (5 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 11:47, p. 11-159, citing Rest.2d Torts, §623A.) Proof of this element is required to prevail on a slander of title claim. (See *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 275 [publisher of disparaging statement only liable if " 'he knows that the statement is false or acts in reckless disregard of its truth or falsity' "]; *Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344, 1360-1361 [explaining that, unlike liability for statements that impugn personal reputation, liability for statements that damage property interests only arises if the publisher " 'knows that the statement is false or acts in reckless disregard of its truth or falsity' "].)

Appellant claims respondents made statements with respect to the ownership of parking space P-1 that were false, or that they acted in reckless disregard of whether these statements were true. In support of this argument, appellant relies on evidence showing respondents stated: (1) Unit 401 had no right to the exclusive use of parking space P-1; (2) Unit 401 had no right to convey such an interest; (3) respondents and all the other condominium owners had the right to share in the use of parking space P-1; (4) the HOA held title to parking space P-1 and could sell it; and (5) the owners of Unit 401 had no legal right to parking space P-1.

However, there is no evidence respondents knew that their statements were false, nor was there evidence from which a jury could find a reckless disregard of the truth or falsity of respondents' assertions. As found by the court, respondents "did not base their opinion upon false facts." Rather, appellant does not meaningfully contest the following

7

undisputed facts which supports respondents' opinion regarding title to parking space P-1:

- The original Declaration defines the "Restricted Common Areas" as "[p]ortions of the Common Area, if any, set aside and allocated for the exclusive use of a Unit Owner or Owners . . . ." The "Restricted Common Areas" are specifically defined to include "the exclusive easement to use . . . parking areas (P-1 through P-3) . . . ." The Declaration goes on to state "Such easements shall be appurtenant to the respective Units as *granted by Declarant in the deed* to the purchasers of the respective Units." (Italics added.)

- The Parcel Map indicates that P-1 through P-3 are "parking areas, easement for the exclusive use of said areas *shall be granted* as appurtenances of particular units." (Italics added.)

- The deeds to Units 201 and 301 specifically conveyed exclusive easements to parking spaces P-2 and P-3 respectively.

- The deed to Unit 401 did not include an exclusive easement to any parking space.

- The original Declaration defines the "Common Area" as "all lands and improvements not within any Unit." The Declaration defines the "Common Interest" as "the proportionate undivided interest in the Common Area which is appurtenant to each Unit . . . ."

- Under the Declaration "the common interest appurtenant to each Unit is declared to *be permanent in character and cannot be altered without the consent of all the Unit Owners affected* . . . ." (Italics added.)

Based on this documentary evidence, respondents had sufficient undisputed facts to support their position that (1) because an exclusive easement to parking space P-1 was not granted to any particular unit, it became part of the Common Area owned by all the unit owners; (2) the title for the easement to parking space P-1 was held by the HOA as the unit owners' representative; and (3) the consent of all the unit owners would be required to grant an exclusive easement for parking space P-1 to any particular unit.

In attempting to point out respondents' flawed reasoning, appellant advances a contrary interpretation of the documentary evidence to assert ownership of parking space P-1, along with the ability to convey it to bona fide purchasers for value, notwithstanding the fact that it is not mentioned in his deed. Such analysis and interpretation of the documentary evidence only confirms that the ownership of parking space P-1 was not clear and reasonable persons could disagree as to the validity of each party's position. If competing interpretations are reasonable, and the matter has not been conclusively resolved, the record cannot support appellant's view that respondents "recklessly and intentionally disregarded the truth" in asserting their claims. Underscoring that respondents had a plausible basis for their interpretation, appellant's *own real estate agent* informed appellant that the title company had concluded that no parking space had been deeded to his unit; and unless the other unit owner's agreed to execute the necessary documents, his power to convey title to space P-1 was questionable.

Until the matter was conclusively resolved through settlement of the quiet title cause of action, the results of which have been kept confidential, the ownership of parking space P-1 was uncertain. As a practical matter, one cannot slander a disputable title that has not been formally adjudicated. (See 57 Cal.Jur.3d (2010) Slander of Title, § 13, pp. 833-834 ["[a] prerequisite to the right to maintain a slander of title action is that the plaintiff must have had an ownership interest in the property involved as of the time of the alleged slander"]; *Howard, supra,* 113 Cal.App.3d at p. 265 ["[a] condition precedent to committing [slander of title] was a judicial proceeding establishing of record the title by adverse possession"]; *Hill*, *supra*, 259 Cal.App.2d at p. 491 [finding defendant was entitled to assert an inconsistent legal interest in himself because the right to the easement "was not definitely and legally determined until the conclusion of the instant action"]; compare, *Phillips v. Glazer* (1949) 94 Cal.App.2d 673, 677-678 [neighbor liable for slander of title after he persisted in claiming ownership of disputed strip of land *after* issue had been resolved against him in quiet title action].)

In conclusion, there is no evidence that respondents falsely claimed some legal interest in parking space P-1, or that respondents' claims were made in reckless disregard

9

of the truth. Until marketable title was established through settlement of the quiet title action, respondents, like appellant, were entitled to press their arguments and assert their ownership interests in parking space P-1 without fear of becoming liable for slander of title. The fact that they did so opportunistically—using it as leverage in their ongoing disputes with appellant and attempt to disrupt appellant's sale of the condominium to the Grotes—does not change the undisputed facts demonstrating that the title to P-1 was genuinely debatable. Consequently, the trial court correctly entered summary judgment on their slander of title claim.

### C. Interference with Existing Contract

The trial court also found appellant did not show any probability of prevailing on the merits of his claim for interference with contract. The factual basis for this cause of action involves appellant's effort to sell Unit 401 to Katharina Rock. By way of background, after living in Unit 401 became "intolerable" for appellant because of the hostility with respondents, he moved out in July 2007, and rented Unit 401 to Rock. She lived in Unit 401 and parked her car in parking space P-1 for about a year without incident. During the summer of 2008, appellant contacted Rock and told her he had decided to sell Unit 401. She expressed a desire to buy it, and they verbally agreed on a $849,000 sales price. However, before the parties entered into a written agreement, Rock backed out of the sale once she learned of ongoing disputes and spoke with respondents about the parking issue, as well as other matters.

Appellant concedes, "[w]hile Ms. Rock and I did not have a written agreement, we had a verbal agreement." Citing the enforceability problem created by the statute of frauds, the court found that "[a]s a matter of law [appellant] cannot prevail on this cause of action because the undisputed facts demonstrate that the Alleged Rock Contract was never a valid and enforceable agreement."

A claim for tortious interference with contractual relations requires proof that: (1) a valid contract existed between the plaintiff and another party; (2) the defendant was a third party who had knowledge of the contract and intended to induce a breach of the contract; (3) the contract was breached; (4) the breach was a proximate result of the

10

defendant's wrongful or unjustified conduct; and (5) the plaintiff suffered resulting damage. (*Abrams & Fox, Inc. v. Briney* (1974) 39 Cal.App.3d 604, 608.) The breach-inducing conduct must be intentional, and must either have been unlawful conduct or conduct otherwise lawful but lacking sufficient justification for the interference. (*Id.* at p. 607.)

The first element of a cause of action for intentional interference with contract is the underlying contract be *enforceable* because "[w]here there is no existing, *enforceable* contract, only a claim for interference with prospective advantage may be pleaded." (*PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 601, original italics (*PMC*), disapproved on other grounds by *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159, fn. 11 (*Korea Supply*).) *PMC* reasoned "[i]t is logical to force the plaintiff to plead and prove an enforceable contract when stating a cause of action for intentional interference with contract. If a party is not obligated to perform a contract and may refuse to do so at his election without penalty, then the other party to that agreement enjoys nothing more than an expectancy. A stranger intentionally interfering with that relationship quite obviously does not disturb an enforceable contract but only a *prospective* economic relationship." (*PMC*, *supra*, at pp. 599-600, original italics.) Consequently, "[w]here there is no existing enforceable contract, only a claim for interference with prospective advantage may be pleaded. To [conclude] otherwise unnecessarily confuses the two torts and fails to recognize their inherent differences." (*Id.* at p. 601, original italics; accord, *A-Mark Coin Co. v. General Mills, Inc.* (1983) 148 Cal.App.3d 312, 322 (*A-Mark*) [unenforceable contract cannot serve as the basis for intentional interference with contract claim].)

As a further example of this foundational requirement, the court in *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867 (*Bed, Bath & Beyond*) concluded a plaintiff could not maintain a cause of action against a third party for intentional interference with a contractual relationship when the underlying contract was unenforceable under the statute of frauds. (*Id.* at pp. 877-880.)

Ignoring the weight of this authority, appellant claims that because respondents "were not parties to the contract and could neither enforce it nor contest its enforceability," they "do not have standing to assert the statute of frauds" in order to "immunize their tortuous conduct." However, this argument is unsupported by any applicable authorities, and ignores the many cases establishing a *third party's* interference with a void or voidable contract cannot form the basis of a cause of action for intentional interference with contractual relations. (See, e.g., *Della Pena v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392, italics added ["[t]he courts provide a damage remedy against *third party conduct* intended to disrupt an existing contract"]; *PMC*, *supra,* 45 Cal.App.4th at pp. 599-600, italics added ["*A stranger* intentionally interfering with that relationship quite obviously does not disturb an enforceable contract but only a prospective economic relationship"]; *Bed, Bath & Beyond*, *supra*, 52 Cal.App.4th at p. 878, italics added [addressing the question "whether *a third party's interference* with a voidable or unenforceable contract can form the basis of a cause of action for intentional interference with contractual relations"].)

Appellant's reliance upon *Zimmerman v. Bank of America* (1961) 191 Cal.App.2d 55 (*Zimmerman*) is equally misguided. Appellant cites *Zimmerman* in support of the proposition that the tort of interference with contract does not require an underlying enforceable contract. However, later decisions have made clear that *Zimmerman* was decided at a time when the two interference torts were improperly blurred together, and its holding only remains applicable to the tort of interference with prospective advantage. (*Bed, Bath & Beyond*, *supra*, 52 Cal.App.4th at p. 880, fn. 9 [cases such as *Zimmerman* "did not draw a clear distinction between tort liability for interference with a contract and tort liability for interference with prospective economic advantage," as it was decided "at a time when that distinction was still blurred in California case law"]; *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 339-340 [noting that *Zimmerman* improperly blurred the line between the two interference torts].)

There is no question that appellant's cause of action for interference with contract required him to plead and prove the existence of an underlying enforceable contract. It

12

goes without saying that a contract for the sale of real property that is not in writing is unenforceable. (Civ. Code, § 1624, subd. (a)(3).) The absence of this element is fatal to appellant's claim against respondents for intentional interference with contractual relations.

### D.  Interference with Prospective Economic Advantage

In finding appellant failed to raise a triable issue of fact with respect to his causes of action for intentional and negligent interference with prospective economic advantage, the trial court found appellant "cannot demonstrate any wrongful conduct" on respondents' part.[5]

The elements for a claim of interference with prospective economic advantage are: " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [or negligent] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' [Citation.]" (*Korea Supply*, *supra*, 29 Cal.4th at p. 1153; *Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 521-522.)

A cause of action for intentional interference with prospective economic relations cannot survive without proof of some wrongful conduct by the defendant. (*National Medical*, *supra*, 62 Cal.App.4th at p. 440.) To be "wrongful" in this context, the conduct must be something more than permissible action that happens to interfere with the plaintiff's prospective economic relations. More specifically, the conduct must be

---

[5] For simplicity, this opinion refers to appellant's claims for both intentional and negligent interference with prospective economic advantage as "interference with prospective economic advantage." The difference between the two torts is not relevant to this appeal. The crucial issue at hand is the requirement that the plaintiff plead some "independently wrongful" conduct on the part of the defendant; whether pleaded as intentional interference or negligent interference, this requirement applies. (See *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 440 (*National Medical*).)

13

" 'illegal or unfair or immoral according to the common understanding of society' " (*Willard v. Caterpillar, Inc.* (1995) 40 Cal App.4th 892, 920), or it must violate "well-defined, established rules or standards of a trade, association or profession" (*Stevenson Real Estate Services, Inc. v. CB Richard Ellis Real Estate Services, Inc.* (2006) 138 Cal.App.4th 1215, 1223), or it must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard. [Citations.]" (*Korea Supply*, *supra*, 29 Cal.4th at p. 1159, fn. omitted.)

For example, in *Korea Supply*, *supra*, 29 Cal.4th at page 1159, it was alleged that the defendant had engaged in bribery and offered sexual favors to key Korean officials in order to obtain a contract from the Republic of Korea. These illegal practices clearly satisfied the independent wrongfulness requirement.

In support of his cause of action for interference with prospective economic advantage here, appellant alleges that respondents "wrongfully assert[ed]" that Unit 401 "did not include any exclusive parking easement." These allegations merely restate the allegations in support of appellant's slander of title claim. However, we have concluded this cause of action fails as a matter of law, so it cannot serve to fulfill the wrongful conduct requirement in order to maintain appellant's interference claims as well.

Additionally, appellant claims respondent Driver interfered with prospective economic relations in or about November 2008 when appellant's real estate agent and lenders were trying to work out a short sale with the Grotes after appellant defaulted on his mortgage payments. The purchase price of Unit 401 was $604,000. Before the short sale closed, respondent Driver wrote letters to appellant's lenders indicating there existed a dispute regarding whether appellant could establish a legal right to exclusive use of a parking space, as well as other disputed issues. The letter claimed appellant had "grossly undervalued his unit, no matter if that unit has parking or not." Respondent Driver claimed the sales price was detrimentally affecting the value of his unit and the building as a whole. Respondent Driver eventually offered to purchase the unit himself, indicating "I can offer the lender a fair price and a quick sale for this unit. A private sale with me will help the lender by saving on real estate commissions, saving on time needed to sell

14

the property through the Multiple Listing Service (MLS), and saving on fees and expenses while the property is owned directly by the lender."

Appellant claims these letters provide evidence of wrongful conduct. However, without the essential slander of title finding, these general allegations are insufficient to show wrongful interference with a prospective economic advantage. As explained in *Korea Supply*, *supra*, 29 Cal.4th at pages 1158-1159, the tort of "interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct. [Citation.]" While respondent Driver's attempt to disrupt the sale of Unit 401 to the Grotes and purchase the condominium for himself may be legitimately criticized as opportunistic, it cannot satisfy the independently wrongful conduct requirement.

As explained in *PMC*, *supra*, 45 Cal.App.4th at page 603, " '[u]nder the privilege of free competition, a competitor is free to divert business to himself as long as he uses fair and reasonable means.' . . . '[T]he competition privilege is defeated only where the defendant engages in *unlawful or illegitimate means*.' [Citation.]" (Fn. omitted; see, e.g., *A-Mark*, *supra*, 148 Cal.App.3d at pp. 323-324 [competitor's conduct could not give rise to liability for interference with prospective economic advantage because there was nothing to suggest "that [the defendants'] motives were other than to advance their own economic interests"].)

While appellant makes generalized allegations that respondent Driver's behavior violated professional ethics as an attorney and breached his fiduciary duties as an officer of the HOA, these general allegations are insufficient to show wrongful acts of interference with a prospective economic advantage. Further guidance on this point is provided by *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, in which the plaintiff sought to establish the wrongfulness of the defendant's conduct by opinion testimony to the effect that the defendant's conduct was unethical, not customary in the pertinent industry, and really bad business. (*Id.* at pp. 1257-1258.) The Court of Appeal rejected "the nebulous 'industry standards' test

15

advanced by Gemini," on the grounds that "[t]he imposition of liability for interference based merely on opinions that the solicitation of a competitor's business was 'unethical' or violated 'industry standards' would create uncertainty and would chill, not maximize, competition." (*Id.* at p. 1259.)

### E. Trial Court's Evidentiary Rulings

In ruling on respondents' evidentiary objections, the trial court sustained their written objections in their entirety. The evidence which was excluded included: excerpts from appellant's declaration supporting his belief he had title to parking space P-1; the opinions of the Unit 201 owners regarding the title to parking space P-1; and an affidavit from one of the original developers of the condominium project as to the meaning and intent of the original documents. In so ruling, appellant claims the court "potentially ignored 48 pieces of evidence that could have created triable issues and defeated summary judgment."

Initially, we reject appellant's argument that the trial court committed prejudicial error when it failed to state, in writing or orally, the specific legal ground or grounds it relied upon in sustaining respondents' evidentiary objections. The trial court's written order stated which objections were sustained and that statement fulfilled any obligation imposed on the trial court. (See suggested format for ruling on evidentiary objections in California Rules of Court, rule 3.1354(b).)

In proceeding to review the court's evidentiary rulings on their merits, we note there is some uncertainty associated with the standard of review applicable to a trial court's rulings on evidentiary objections related to a motion for summary judgment. In *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, the court noted that the proper standard of review for rulings on evidentiary objections based on papers alone was not settled. (*Id.* at p. 255, fn. 4.) Recently, the California Supreme Court stated that "we need not decide generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.)

16

Regardless of the appropriate standard of review of the trial court's evidentiary rulings, appellant is required to show that any error or abuse of discretion by the trial court in its evidentiary rulings is prejudicial. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 (*Carnes*) [Cal. Const., art. VI, § 13 requires anyone seeking reversal of a judgment to show error was prejudicial].)

Appellant neglects to establish he was prejudiced by the trial court's evidentiary rulings, i.e., he fails to provide any argument or analysis demonstrating how the excluded evidence created a triable issue of material fact such that summary judgment was not warranted. "The burden is on the appellant in every case to show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice. [Citation.]" (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

Except for the bald, conclusory statement that the stricken evidence did establish material issue of fact precluding summary judgment, appellant has made no attempt to explain on appeal how any of the evidence excluded by the trial court would have raised a triable issue of material fact on the key issues in this summary judgment motion. (*County of Los Angeles v. Nobel Ins. Co.* (2000) 84 Cal.App.4th 939, 945 [" 'appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice' "].) For this reason alone, we are entitled to reject appellant's claim that the trial court erred in excluding the challenged evidence. (*Carnes*, *supra*, 126 Cal.App.4th at p. 694 ["Plaintiff has failed to show she was prejudiced by the trial court's adoption of evidentiary rulings proposed by defendant's attorneys"].)

## IV.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

 

                                                 _____

                                                 RUVOLO, P. J.

We concur:

_____

RIVERA, J.

_____

HUMES, J.